**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.** 10-10089-WEB |
| | ) | |
| **JAMES BOBBY BUTLER, JR., and** | ) | |
| **MARLIN JACKSON BUTLER,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

# INDICTMENT

The Grand Jury charges:

The following statements were true at all times relevant to this Indictment:

## The Defendants

1. JAMES BOBBY BUTLER, JR., (hereinafter "JAMES BUTLER") was a resident of Martinsville, Texas, and owner and operator of a hunting club near Coldwater, Kansas, in Comanche County, known as Camp Lone Star. JAMES BUTLER organized and led guided deer hunts around Camp Lone Star and on numerous nearby properties which he leased for that purpose. JAMES BUTLER handled the finances for Camp Lone Star, including collecting payments from guided hunters, arranging for the leases of nearby hunting properties, and paying for food, electricity, and other costs and expenses, including the accommodation, meals, and other services provided to employees and to guided hunters.

2. MARLIN JACKSON BUTLER (hereinafter "MARLIN BUTLER"), also a resident of Martinsville, Texas, is JAMES BUTLER's brother and was a guide and frequent

hunter at Camp Lone Star. As compensation for his guiding and other work at Camp Lone Star, MARLIN BUTLER received $500 per week plus tips from guided hunters, as well as free hunting privileges. MARLIN BUTLER also sometimes charged guided hunters directly for his guiding services.

## Legal Framework

### *A. The Lacey Act*

3. The Lacey Act Amendments of 1981, 16 U.S.C. § 3371 *et seq.* (hereinafter "the Lacey Act"), make it unlawful for any person knowingly to transport or sell in interstate commerce any wildlife which the person knows to have been taken, possessed, transported, or sold in violation of any law or regulation of any State. 16 U.S.C. § 3372(a)(2)(A). For Lacey Act purposes, the term "taken" means captured, killed, or collected. 16 U.S.C. § 3371(j)(1).

4. Under the Lacey Act, "wildlife" is defined to include any wild animal, including white-tailed deer and mule deer, whether alive or dead, and including any part or product thereof. 16 U.S.C. § 3371(a).

5. Under the Lacey Act, it is deemed to be a sale of wildlife for any person, for money or other consideration, to provide guiding, outfitting, or other services, or a hunting permit, for the illegal taking, acquiring, receiving, transporting, or possessing of wildlife. 16 U.S.C. § 3372(c)(1).

### *B. Deer Hunting under Kansas Law*

#### 1. License Requirement

6. Kansas law makes it unlawful to hunt in the State without a valid hunting license. KSA §§ 32-919, 32-1001. "Hunt" means to take wildlife in any manner, and "take" is defined

under state law to include shooting, wounding, killing, possessing, otherwise taking, or attempting to do any of those things. KSA § 32-701.

2. Permit Requirement

7. A valid permit is also required to hunt big game, such as white-tailed deer and mule deer, in Kansas. KSA § 32-937(b). Deer permits are issued annually, by deer management unit, on the basis of a priority draw system, or lottery. KAR § 115-4-11(b). Each hunter is limited to one antlered deer permit per year. KAR § 115-4-11(a)(1).

a. Non-resident Hunters

8. Non-resident hunters may obtain Kansas deer permits in two ways. First, non-resident hunters may apply for and obtain deer permits directly, subject to certain limitations. KSA § 32-937(*l*). Such permits are restricted to particular locations, seasons, equipment, species, and antler categories, as discussed below.

9. Second, prior to June 30, 2007, non-resident hunters could obtain so-called "landowner transferable" permits. At that time, Kansas landowners and tenants could obtain non-resident deer permits for the purpose of transferring or selling those permits to other resident or non-resident hunters. Such permits were subject to the same season, equipment, species, and antler category restrictions as other non-resident permits, described below. However, landowner transferable permits were valid only within one or two designated counties (rather than units) in which the qualifying landowner or tenant's lands were located. KSA § 32-937(n) (2007).

b. Deer Management Units

10. Non-resident deer permits are valid only within one designated deer management unit and one additional adjoining deer management unit, both of which must be designated at the

time of application. KSA § 32-937(*l*); KAR §§ 115-4-13(a)(3), 115-4-6 (specifying deer management units).

11. Camp Lone Star is located in Comanche County, Kansas, in Deer Management Unit 16, a unit known for its "trophy" class deer.

c. Seasons and Equipment

12. Both non-resident and landowner transferable deer permits authorize hunting only with specified equipment for one of the following deer seasons, which must be selected at the time of the application: muzzleloader-only season, archery season, or firearms season. KSA § 32-937(*l*); KAR §§ 115-4-13(a)(3), 115-4-4 (specifying legal equipment for each season).

d. Species and Antler Category

13. All deer permits are valid only for the species of deer (such as white-tailed deer or mule deer) and the antler category reflected on the permit. KAR § 115-4-13(d).

3. Carcass Tags

14. For all big game hunting, including deer hunting, Kansas law requires that a carcass tag be permanently fixed to the carcass immediately after the animal is killed and before the animal is moved from the site of the kill. KSA § 32-937(n); KAR § 115-4-2(a)(1). It is unlawful to possess any big game animal, including a deer, that has not been properly tagged. KSA § 32-1004.

4. Prohibited Methods

15. Kansas law prohibits the taking of any game animal, including deer, from a motor vehicle. KSA § 32-1003(1). It is also unlawful for any person, while armed, to use a spotlight, headlight, or other artificial light for the purpose of spotting, locating, or taking wildlife (subject

to certain exceptions for agricultural and surveillance activities and taking of nuisance animals). KSA § 32-1003(7).

**COUNT 1**

**(CONSPIRACY TO VIOLATE THE LACEY ACT)**

16. Paragraphs 1 through 15 of this Indictment are hereby re-alleged and reincorporated as if fully set forth herein.

17. Beginning no later than 2005 and continuing until at least 2008, within the District of Kansas and elsewhere, defendants

**JAMES BUTLER and MARLIN BUTLER**

did knowingly and intentionally conspire, confederate, and agree, with each other and with other persons both known and unknown to the Grand Jury, to knowingly commit acts in violation of the laws of the United States, to wit: to knowingly engage in conduct involving the sale and purchase of wildlife, namely white-tailed deer and mule deer, with a market value in excess of $350, by knowingly selling and transporting said wildlife in interstate commerce between Kansas and other states, knowing the wildlife to have been taken and possessed in violation of the laws and regulations of the State of Kansas, specifically KSA §§ 32-919, 32-937, 32-1001 to 1004, and KAR §§ 115-4-2, 115-4-4, 115-4-11, 115-4-13, and 115-25-9, all in violation of the Lacey Act, 16 U.S.C. §§ 3372(a)(2)(A) and 3373(d)(1)(B).

Manners and Means of the Conspiracy

18. During the period of time relevant to the charges in this Indictment, JAMES BUTLER and MARLIN BUTLER employed the following manners and means to accomplish the object of the conspiracy:

a. JAMES BUTLER organized and led guided deer hunts based at Camp Lone Star and on nearby properties, charging out-of-state hunters approximately $3,500 per hunt with archery equipment and $5,000 per hunt with a firearm.

b. JAMES BUTLER leased several ranch properties near Camp Lone Star for the purpose of guiding white-tailed deer and mule deer hunts. The leased properties, which included the Box Ranch, Huck Ranch, the Oasis 7 Ranch, and several smaller properties, allowed the defendants access to approximately 50,000 acres for their hunting and guiding activities.

c. JAMES BUTLER hired guides, including MARLIN BUTLER and others, to lead hunters to hunting locations and to perform other services, such as cleaning and skinning deer killed by the hunters.

d. JAMES BUTLER, MARLIN BUTLER, and others provided hunters with food and accommodations, as well as other services, at Camp Lone Star.

e. During guided hunts, JAMES BUTLER, MARLIN BUTLER, and other guides at Camp Lone Star, directed, permitted, and encouraged hunters to take and possess white-tailed deer illegally, including by hunting without a valid license or permit, by hunting with permits not valid in the county and unit where the hunt occurred, by hunting with illegal equipment (*i.e.*, by using firearms during archery season),

by taking deer in excess of the bag limit, by hunting after shooting hours and "spotlighting," and by failing to tag deer immediately after they were killed or failing to tag them at all. These illegal hunting practices allowed guided hunters to kill more deer than they could have killed lawfully, thereby resulting in more guiding fees and tips for the defendants, and in many instances also helped to conceal the illegal hunting activity at the camp.

f. JAMES BUTLER and MARLIN BUTLER instructed guided hunters to apply for and obtain, and assisted them in applying for and obtaining, deer permits for units other than Unit 16, for unlawful use within Unit 16.

g. JAMES BUTLER also purchased "landowner transferable permits" for units other than Unit 16 and counties other than Comanche County, and sold the permits to guided hunters for unlawful use within Unit 16 and within Comanche County.

h. JAMES BUTLER and MARLIN BUTLER referred guided hunters to a taxidermist with the initials JR, a resident of Texas, for taxidermy services on deer killed during illegal guided hunts at Camp Lone Star, and arranged for transportation of the deer from Kansas to Texas.

<u>Overt Acts</u>

19. In furtherance of the conspiracy, and in order to effect its object, JAMES BUTLER and MARLIN BUTLER, defendants herein, along with others both known and unknown to the Grand Jury, committed or caused to be committed one or more of the following overt acts in the District of Kansas and elsewhere:

20. a. In or about September 2005, JAMES BUTLER sold a guided hunt to JK, a resident of Center, Texas, for $3,500, and also sold JK a permit for Unit 10.

b. During the guided hunt in or about September 2005, JK killed a 170 class white-tailed deer in Unit 16 with a permit for Unit 10.

c. After JK's guided hunt in or about September 2005, the antlers and cape of the deer were transported from Kansas to Texas, where JR performed the taxidermy work for between $650 and $750.

21. a. In or after September 2005, JAMES BUTLER sold a guided hunt to BH, a resident of Houston, Texas, for $5,000.

b. During the hunt in or after September 2005, while guided by JAMES BUTLER, BH killed an eight-point white-tailed deer.

c. On a later day in or after September 2005, JAMES BUTLER sold BH a second guided hunt for $250 per day, plus $2,500 when the animal was killed.

d. During his second guided hunt in or after September 2005, BH killed a mule deer in excess of his bag limit.

22. a In or after September 2005, JAMES BUTLER sold a guided hunt to RP, a resident of Center, Texas, for $3,500.

b. During the guided hunt in or after September 2005, RP killed a white-tailed deer in Unit 16 with a Unit 10 permit, which he obtained from JAMES BUTLER after he killed the deer.

c. After his guided hunt in or after September 2005, RP transported the antlers and cape of the deer from Kansas to Texas, where JR performed the taxidermy work for $650.

23. a In or after September 2005, JAMES BUTLER sold a guided hunt to RH, a resident of Henderson, Texas.

b. During the guided hunt in or after September 2005, RH killed two white-tailed deer, including a 160 class buck, for which he paid JAMES BUTLER $5,000 and $2,500.

c. During the guided hunt in or after September 2005, JAMES BUTLER offered to provide RH with an "extra" tag for the second deer, which JAMES BUTLER knew to be taken in excess of the bag limit.

d. During RH's guided hunt in or after September 2005, JR guided RH during the second hunt, and subsequently transported the antlers and capes of the deer from Kansas to Texas, where he performed the taxidermy work for at least $650.

24. a. In or after September 2005, JAMES BUTLER sold a guided hunt to ML, a resident of Center, Texas, for $5,000.

b. During the guided hunt in or after September 2005, while guided by MARLIN BUTLER, ML killed a ten-point white-tailed deer in Unit 16 with a Unit 10 permit, and using a rifle during muzzleloader season.

c. After the guided hunt in or after September 2005, ML's deer was subsequently transported to Texas, where JR performed the taxidermy work for $650.

25. a. In or about November 2005, JAMES BUTLER sold a guided hunt to TM, a resident of Lafayette, Louisiana, for $3,500.

b. During the guided hunt in or about November 2005, TM shot a deer while guided by MARLIN BUTLER, but MARLIN BUTLER said they should not retrieve the deer because it was getting dark.

c. On the second day of the guided hunt in or about November 2005, JAMES BUTLER invited TM to kill a second deer.

d. On the second day of the guided hunt in or about November 2005, while guided by JAMES BUTLER, TM killed a 160 class white-tailed deer.

e. After TM's guided hunt in or about November 2005, JR transported the antlers and cape from TM's 160 class deer from Kansas to Texas, where he performed the taxidermy work, and subsequently delivered the mount to TM in Louisiana.

26. a. In or about November 2005, JAMES BUTLER sold a guided hunt to BS, a resident of Arnaudville, Louisiana, for $3,500, plus $1,800 for a landowner transferable permit valid for Kiowa County.

b. During the guided hunt in or about November 2005, BS killed a 160 or 170 class white-tailed deer in Comanche County with a permit valid for Kiowa County.

c. During the guided hunt in or about November 2005, JAMES BUTLER asked BS if he would like to kill a second deer for $3,500, after which BS killed a 160 class buck with two drop tines, which was killed without a valid permit and in excess of the bag limit.

d. During the guided hunt in or about November 2005, MARLIN BUTLER assisted in the recovery and transport of BS's second deer.

e. After the guided hunt in or about November 2005, the antlers and capes from BS's deer were subsequently transported from Kansas to Texas, where JR performed the taxidermy work for at least $650.

27. a. In or about late November or early December 2005, JAMES BUTLER sold a guided hunt to JK, a resident of Center, Texas, for approximately $2,500 or $3,000.

b. During the guided hunt in or about late November or early December 2005, JK killed a white-tailed deer without a valid permit and in excess of the bag limit.

c. After his guided hunt in or about late November or early December 2005, JK transported the antlers and cape from Kansas to Texas for taxidermy work.

28. a. In or about December 2005, JAMES BUTLER sold a guided hunt to SL, a resident of Center, Texas, for $5,000.

b. During the guided hunt in or about December 2005, while guided by MARLIN BUTLER, SL killed a 170 class buck white-tailed deer, without a hunting license or deer permit.

c. After SL's guided hunt in or about December 2005, JAMES BUTLER and MARLIN BUTLER skinned and cleaned the deer.

d. After SL's guided hunt in or about December 2005, SL transported the antlers and cape from Kansas to Texas, where JR performed the taxidermy work for $650.

29. a. In or about December 2005 or early January 2006, JAMES BUTLER sold a guided hunt to BH, a resident of Houston, Texas, for $5,000. It was BH's third guided hunt of the season at Camp Lone Star, having killed a white-tailed deer and a mule deer in or about September 2005.

b. During his third guided hunt of the season, in or about December 2005 or early January 2006, while guided by MARLIN BUTLER, BH killed a white-tailed deer, in excess of his bag limit.

30. During the 2006 hunting season, JAMES BUTLER paid RR $200 per week to guide hunters and perform other work at Camp Lone Star. RR also received food, lodging, and gas money, as well as tips from guided hunters and free hunting privileges, as part of his compensation.

31. During the Fall of 2006, JAMES BUTLER told RR not to discuss illegal activities at Camp Lone Star related to deer poaching.

32. a. In or after September 2006, JAMES BUTLER sold a guided hunt to RP, a resident of Center, Texas, for $3,500.

b. During the guided hunt in or after September 2006, RP killed a white-tailed deer in Unit 16 with a landowner transferable permit valid in Elk County (Unit 14), which he obtained from JAMES BUTLER.

c. After RP's guided hunt in or after September 2006, MARLIN BUTLER skinned and cleaned the deer.

d. After his guided hunt in or after September 2006, RP transported the antlers and cape from Kansas to Texas, where JR performed the taxidermy work.

33. a. In or after September 2006, JAMES BUTLER sold a guided hunt to BR, a resident of Joaquin, Texas, for $3,500, plus $400 for a landowner transferable deer permit valid in Elk County.

b. During the guided hunt in or about September 2006, which was guided by MARLIN BUTLER, BR killed a white-tailed deer in Unit 16 with a permit for Elk County (Unit 14), which he had obtained from JAMES BUTLER before the hunt.

c. After the guided hunt in or after September 2006, BR transported the deer from Kansas to Texas.

34. a. In or about late October 2006, JAMES BUTLER sold a guided hunt to SL, a resident of Center, Texas, for $5,500.

b. During the guided hunt in or about late October 2006, while guided by MARLIN BUTLER, SL killed a white-tailed deer in Unit 16 with a Unit 14 permit obtained for him by JAMES BUTLER. The deer was not tagged and was left where it was killed.

c. During the guided hunt in or about late October 2006, MARLIN BUTLER invited SL to continue hunting, which SL did and later paid MARLIN BUTLER a $500 tip.

d. A few days later during the guided hunt in or about late October 2006, again while guided by MARLIN BUTLER, SL killed a second white-tailed deer in Unit 16 with the same Unit 14 permit, using a firearm during archery season, and in excess of his bag limit.

e. After SL's guided hunt in or about late October 2006, JAMES BUTLER and JR skinned and cleaned the animal, the antlers and cape of which SL transported from Kansas to Texas, where JR performed the taxidermy work for $650.

35. a. In or about late October or early November 2006, JAMES BUTLER sold a guided hunt to CB, a resident of Joaquin, Texas, for $3,500, as well as a deer permit valid in Elk County (Unit 14) for $322.

b. During the guided hunt in or about late October or early November 2006, while guided by JAMES BUTLER, CB killed a white-tailed deer in Unit 16 with the Elk County (Unit 14) permit he obtained from JAMES BUTLER.

c. After the guided hunt in or about late October or early November 2006, at JAMES BUTLER's instruction, CB's deer was left where it was killed until nighttime, when JAMES BUTLER and CB returned and removed the antlers and cape of the deer.

d. After the guided hunt in or about late October or early November 2006, CB transported the antlers and cape from Kansas to Texas, where JR performed the taxidermy work for $750.

36. a. In or about November 2006, JAMES BUTLER sold a guided hunt to BS, a resident of Arnaudville, Louisiana, for $4,000 per deer.

b. During the guided hunt in or about November 2006, BS killed three white-tailed deer. The second and third deer, both 180 class bucks, were killed while BS was being guided by MARLIN BUTLER. Those deer were left where they were killed until after dark, when JAMES BUTLER, MARLIN BUTLER, BS, and RR retrieved them.

c. After BS's guided hunt in or about November 2006, JR transported the antlers and capes from Kansas to Texas for taxidermy work, for which he charged at least $1,300, and then delivered the mounts to BS in Louisiana.

37. a. In or about November 2006, JAMES BUTLER sold a guided hunt to JK, a resident of Center, Texas, for at least $3,000.

b. During the guided hunt in or about November 2006, JK killed three white-tailed deer without a permit. The second deer was killed while JK and MARLIN BUTLER were driving around "spotlighting." JK cut the head

off of the deer and transported it back to Camp Lone Star. The third deer, approximately 160 class, was also killed while "spotlighting" with MARLIN BUTLER.

c. After JK's guided hunt in or about November 2006, his first and second deer were transported from Kansas to Texas, where JR performed the taxidermy work for between $650 and $750 per mount.

38. During the 2007 hunting season, JAMES BUTLER paid RR $250 per week to guide hunters and perform other work at Camp Lone Star. RR also received food, lodging, and gas money, as well as tips from guided hunters and free hunting privileges, as part of his compensation.

39. a. In or about August 2007, MARLIN BUTLER instructed JL, a resident of Shelbyville, Texas, to purchase a Kansas white-tailed deer permit for Unit 10, in preparation for a guided hunt at Camp Lone Star (in Unit 16).

b. In or about September 2007, MARLIN BUTLER sold a five-day guided hunt to JL, for $5,000.

c. During the guided hunt in or about September 2007, JL killed a white-tailed deer in Unit 16 with a Unit 10 permit, and using a rifle during muzzleloader season, while being guided by RR.

d. After the guided hunt in or about September 2007, MARLIN BUTLER removed the antlers and cape from JL's deer and transported the cape from Kansas to Texas.

40. a. In or about November 2007, JAMES BUTLER sold a five-day guided hunt to SL, a resident of Center, Texas, for $5,500.

b. During the guided hunt in or about November 2007, SL killed a white-tailed deer with a firearm during archery season, after shooting hours, while MARLIN BUTLER held a flashlight.

c. After the guided hunt in or about November 2007, SL and MARLIN BUTLER transported the deer back to Camp Lone Star, where it was skinned and cleaned by SL, MARLIN BUTLER, and RR.

41. a. In or about November 2007, JAMES BUTLER sold a guided hunt to JK, a resident of Center, Texas, for at least $3,000.

b. During the guided hunt in or about November 2007, JK killed several white-tailed deer.

c. After JK's guided hunt in or about November 2007, RR transported the antlers of the first deer from Kansas to Texas, and JK transported the antlers of at least two other deer from Kansas to Texas, where JR performed taxidermy work on one of the deer for between $650 and $750.

42. During or before the 2008 hunting season, JAMES BUTLER instructed RF to purchase Kansas deer permits for JAMES BUTLER and other non-resident hunters for units other than Unit 16, knowing that the intention was to use the permits to hunt in Unit 16. JAMES BUTLER told RF that applying for permits in other units was the only way that everyone was going to get a Kansas deer permit.

All in violation of 18 U.S.C. § 371.

**COUNTS 2 to 20**

**(LACEY ACT - UNLAWFUL SALE AND TRANSPORT OF WILDLIFE)**

43. Paragraphs 1 through 15 of this Indictment are hereby re-alleged and reincorporated as if fully set forth herein.

44. On or about the dates listed below, within the District of Kansas and elsewhere, the defendants listed below did knowingly engage in conduct involving the sale and purchase of wildlife, namely white-tailed deer and mule deer, with a market value in excess of $350, by knowingly selling and transporting said wildlife in interstate commerce between Kansas and others states including Texas and Louisiana, knowing the wildlife to have been taken and possessed in violation of the laws and regulations of Kansas, specifically KSA §§ 32-919, 32-937, 32-1001 to 1004, and KAR §§ 115-4-2, 115-4-4, 115-4-11, 115-4-13, and 115-25-9, as described below:

| Count | Date | Conduct | Defendant(s) |
|---|---|---|---|
| 2 | September 2005 | Sale of guiding and other services, and a hunting permit, to JK, a resident of Texas, knowing that JK killed a white-tailed deer in Unit 16 with a Unit 10 permit; and transport of antlers from Kansas to Texas for taxidermy work | **JAMES BUTLER** |
| 3 | September 2005 | Sale of guiding and other services to BH, a resident of Texas, knowing that BH killed a mule deer in excess of his bag limit; and transport of antlers from Kansas to Texas | **JAMES BUTLER** |

| | | | |
|---|---|---|---|
| 4 | September 2005 | Sale of guiding and other services, and a hunting permit, to RP, a resident of Texas, knowing that RP killed a white-tailed deer in Unit 16 with a Unit 10 permit; and transport of antlers from Kansas to Texas for taxidermy work | **JAMES BUTLER** |
| 5 | September 2005 | Sale of guiding and other services to RH, a resident of Texas, knowing that RH killed a white-tailed deer in excess of his bag limit; and transport of antlers from Kansas to Texas for taxidermy work | **JAMES BUTLER** |
| 6 | September 2005 | Sale of guiding and other services to ML, a resident of Texas, knowing that ML killed a white-tailed deer in Unit 16 with a Unit 10 permit; and transport of antlers from Kansas to Texas for taxidermy work | **JAMES BUTLER, MARLIN BUTLER** |
| 7 | November 2005 | Sale of guiding and other services to TM, a resident of Louisiana, knowing that TM killed a white-tailed deer in excess of his bag limit; and transport of antlers from Kansas to Texas for taxidermy work and delivery to TM in Louisiana | **JAMES BUTLER, MARLIN BUTLER** |
| 8 | November 2005 | Sale of guiding and other services, and a hunting permit, to BS, a resident of Louisiana, knowing that BS killed 2 white-tailed deer with a permit valid for another county, the second of which was also killed in excess of his bag limit; and transport of antlers from Kansas to Texas for taxidermy work | **JAMES BUTLER, MARLIN BUTLER** |

| | | | |
|---|---|---|---|
| 9 | Late November or early December 2005 | Sale of guiding and other services to JK, a resident of Texas, knowing that JK killed a white-tailed deer without a permit and in excess of his bag limit; and transport of antlers from Kansas to Texas | **JAMES BUTLER** |
| 10 | December 2005 | Sale of guiding and other services to SL, a resident of Texas, knowing that SL killed a white-tailed deer without a license or permit; and transport of antlers from Kansas to Texas for taxidermy work | **JAMES BUTLER, MARLIN BUTLER** |
| 11 | December 2005 or January 2006 | Sale of guiding services to BH, a resident of Texas, knowing that BH killed a white-tailed deer in excess of his bag limit; and transport of antlers from Kansas to Texas | **JAMES BUTLER, MARLIN BUTLER** |
| 12 | September 2006 | Sale of guiding and other services, and a hunting permit, to RP, a resident of Texas, knowing that RP killed a white-tailed deer in Unit 16 with an Elk County (Unit 14) permit; and transport of antlers from Kansas to Texas for taxidermy work | **JAMES BUTLER, MARLIN BUTLER** |
| 13 | September 2006 | Sale of guiding and other services, and a hunting permit, to BR, a resident of Texas, knowing that BR killed a white-tailed deer in Unit 16 with a Elk County (Unit 14) permit; and transport of antlers from Kansas to Texas | **JAMES BUTLER, MARLIN BUTLER** |
| 14 | October 2006 | Sale of guiding and other services to SL, a resident of Texas, knowing that SL killed two white-tailed deer in Unit 16 with a Unit 14 permit, the second of which deer was killed using a firearm during archery season and in excess of his bag limit; and transport of antlers from Kansas to Texas for taxidermy work | **JAMES BUTLER, MARLIN BUTLER** |

| | | | |
|---|---|---|---|
| 15 | Late October or early November 2006 | Sale of guiding and other services, and a hunting permit, to CB, a resident of Texas, knowing that CB killed a white-tailed deer in Unit 16 with a permit for Elk County (Unit 14) and possessed an untagged deer carcass; and transport of antlers from Kansas to Texas for taxidermy work | **JAMES BUTLER** |
| 16 | November 2006 | Sale of guiding and other services to BS, a resident of Louisiana, knowing that BS killed two white-tailed deer in excess of his bag limit and possessed an untagged deer carcass; and transport of antlers from Kansas to Texas for taxidermy work and delivery to BS in Louisiana | **JAMES BUTLER, MARLIN BUTLER** |
| 17 | November 2006 | Sale of guiding and other services to JK, a resident of Texas, knowing that JK killed three white-tailed deer without a permit, the second and third in excess of his bag limit and while "spotlighting"; and transport of antlers from Kansas to Texas for taxidermy work | **JAMES BUTLER, MARLIN BUTLER** |
| 18 | September 2007 | Sale of guiding and other services to JL, a resident of Texas, knowing that JL killed a white-tailed deer in Unit 16 with a Unit 10 permit using a rifle during muzzleloader season; and transport of antlers from Kansas to Texas | **MARLIN BUTLER** |
| 19 | November 2007 | Sale of guiding and other services to SL, a resident of Texas, knowing that SL killed a white-tailed deer with a firearm during archery season, after shooting hours, while "spotlighting"; and transport of antlers from Kansas to Texas | **JAMES BUTLER, MARLIN BUTLER** |

| | | | |
|---|---|---|---|
| 20 | November 2007 | Sale of guiding and other services to JK, a resident of Texas, knowing that JK killed several white-tailed deer in excess of his bag limit; and transport of antlers from Kansas to Texas for taxidermy work | **JAMES BUTLER** |

All in violation of the Lacey Act, 16 U.S.C. §§ 3372(a)(2)(A) and 3373(d)(1)(B), and 18 U.S.C. § 2.

## COUNT 21

**(OBSTRUCTION OF JUSTICE)**

45. Paragraphs 1 through 15 of this Indictment are hereby re-alleged and reincorporated as if fully set forth herein.

46. On or about April 7, 2009, and April 8, 2009, within the District of Kansas and elsewhere, including the State of Texas, defendant

**JAMES BUTLER**

did corruptly alter, destroy, and conceal, and attempt to alter, destroy and conceal, objects, namely six mounted white-tailed deer heads with antlers, with the intent to impair those objects' integrity and availability for use in an official proceeding in the District of Kansas, that is an investigation by the United States Fish and Wildlife Service and subsequent criminal prosecution, by instructing an employee to remove the mounts from the premises of High Roller Whitetails and to destroy and conceal the mounts.

All in violation of 18 U.S.C. § 1512(c)(1) and 18 U.S.C. § 2.

**COUNT 22**

**(OBSTRUCTION OF JUSTICE)**

47. Paragraphs 1 through 15 of this Indictment are hereby re-alleged and reincorporated as if fully set forth herein.

48. On or about April 8, 2009, within the District of Kansas and elsewhere, including the State of Texas, defendant

**JAMES BUTLER**

did corruptly obstruct, influence, and impede, and attempt to obstruct, influence, and impede, an official proceeding in the District of Kansas, that is an investigation by the United States Fish and Wildlife Service and subsequent criminal prosecution, by instructing an employee of High Roller Whitetails to tell investigators that JAMES BUTLER did not guide hunters at Camp Lone Star, when in fact JAMES BUTLER did guide hunters at the camp and charged them for such guiding services.

All in violation of 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 2.

**COUNT 23**

**(OBSTRUCTION OF JUSTICE)**

49. Paragraphs 1 through 15 of this Indictment are hereby re-alleged and reincorporated as if fully set forth herein.

50. On or about April 8, 2009, within the District of Kansas and elsewhere, including the State of Texas, defendant

**JAMES BUTLER**

did corruptly obstruct, influence, and impede, and attempt to obstruct, influence, and impede, an official proceeding in the District of Kansas, that is an investigation by the United States Fish and Wildlife Service and subsequent criminal prosecution, by falsely stating to a Special Agent of the United States Fish and Wildlife Service:

1) That he was never paid for guiding or other services by hunters at Camp Lone Star; and

2) That he had no knowledge of any illegal activity at Camp Lone Star and would not tolerate any violation of hunting laws;

when in truth and in fact, JAMES BUTLER then well knew and believed that he was regularly paid for guiding and other services by hunters at Camp Lone Star, and that he had personal knowledge of illegal activities at Camp Lone Star, including violations of hunting laws which he had personally observed, directed, and otherwise knew about.

All in violation of 18 U.S.C. § 1512(c)(2).

**FORFEITURE NOTICE**

51. The allegations contained in Counts 1-20 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 16, United States Code, Section 3374.

**JAMES BOBBY BUTLER, JR.**

**MARLIN JACKSON BUTLER**

are hereby notified that upon conviction of any of the offenses alleged in Counts 1-20 to which forfeiture would apply, the defendants,

**JAMES BOBBY BUTLER, JR.**

**MARLIN JACKSON BUTLER**

shall forfeit to the United States pursuant to Title 16, United States Code, Section 3374, Title 28, United States Code, Section 2461, and any and all other applicable provisions of forfeiture under the Customs laws, any property imported, exported, transported, sold, received, acquired, or purchased, or used to aid in the importing, exporting, transporting, selling, receiving, acquiring, or purchasing of fish or wildlife or plants, including but not limited to the following property:

ST #81839 – Whitetail deer antlers scoring 150 3/8 inches and having an inside antler spread of 17 4/8 inches.
ST #81840 – A single five-point whitetail deer antler scoring 65 5/8 inches.
ST #81843 – Whitetail European deer mount scoring 105 2/8 inches and having an inside antler spread of 10 2/8 inches.
ST #81846 – Mule deer mount scoring 174 4/8 inches and having an inside antler spread of 24 1/8 inches.
ST #81847 – Whitetail deer mount scoring 151 7/8 inches and having an inside antler spread of 21 4/8 inches.
ST #81848 – Whitetail deer mount scoring 162 1/8 inches and having an inside antler spread of 19 3/8 inches.
ST #81849 – Whitetail deer mount scoring 181 3/8 inches and having an inside antler spread of 15 2/8 inches.
ST #81850 – European whitetail deer mount scoring 129 2/8 inches and having an inside antler spread of 17 6/8 inches.
ST #756407 – Whitetail deer mount scoring 170 inches and having an inside antler spread of 16 2/8 inches.
ST #756410 – Whitetail deer mount scoring 176 2/8 inches and having an inside antler spread of 22 6/8 inches.
ST #756411 – Whitetail deer mount scoring 235 7/8 inches and having an inside antler spread of 19 4/8 inches.
ST #756414 – Whitetail deer mount scoring 153 4/8 inches and having an inside antler spread of 19 5/8 inches.
ST #756412 – Whitetail deer mount scoring 152 7/8 inches and having an inside antler spread of 19 4/8 inches.
ST #756418 – Whitetail deer mount scoring 176 3/8 inches and having an inside antler spread of 20 3/8 inches.
ST #756420 – Whitetail deer mount scoring 187 7/8 inches and having an inside antler spread of 21 4/8 inches.
ST #756429 – Whitetail deer mount scoring 156 2/8 inches and having an inside antler spread of 22 6/8 inches.

ST #756439 – Whitetail deer antlers scoring 142 1/8 inches and having an inside antler spread of 17 1/8 inches.
ST #756440 – Whitetail deer antlers scoring 159 6/8 inches and having an inside antler spread of 18 5/8 inches.
ST #756441 – Whitetail deer antlers scoring 144 inches and having an inside antler spread of 16 1/8 inches.
ST #756442 – Mule deer antlers scoring 157 inches and having an inside antler spread of 19 1/8 inches.
ST #756443 – Whitetail deer antlers scoring 145 6/8 inches and having an inside antler spread of 15 7/8 inches.
ST #756444 – Whitetail deer antlers scoring 160 inches and having an inside antler spread of 17 4/8 inches.
ST #756445 – Whitetail deer antlers scoring 156 7/8 inches and having an inside antler spread of 23 1/8 inches.
ST #832676 - 1 – Whitetail deer mount scoring 126 1/8 inches and having an inside antler spread of 12 inches.
ST #871595 – Whitetail deer mount scoring 147 5/8 inches and having an inside antler spread of 17 inches.
ST #871596 – Whitetail deer mount scoring 159 3/8 inches and having an inside antler spread of 15 1/8 inches.
ST #871597 – Whitetail deer mount scoring 185 1/8 inches and having an inside antler spread of 21 5/8 inches.
ST #871598 - Whitetail deer mount scoring 161 2/8 inches and having an inside antler spread of 19 inches.
ST #871599 – Whitetail deer mount scoring 160 4/8 inches and having an inside antler spread of 14 4/8 inches.
ST #871600 – Whitetail deer antlers scoring 131 4/8 inches and having an inside antler spread of 14 6/8 inches.
ST #864715 - 85 – Whitetail deer mount scoring 135 4/8 inches and having an inside antler spread of 13 4/8 inches.
ST #864715 - 93 – European whitetail deer mount scoring 128 3/8 inches and having an inside antler spread of 19 inches.
ST #864715 - 94 – European whitetail deer mount scoring 139 3/8 inches and having an inside antler spread of 19 inches.
ST #864715 - 96 – Scored 128 3/8 inches and had an inside antler spread of 19 inches.
ST #864715 - 95 – Scored 139 3/8 inches and had an inside antler spread of 19 inches.
ST #864726 - 3 – European whitetail deer mount scoring 166 inches and having an inside antler spread of 20 4/8 inches.
ST #864379 - 5 – Whitetail deer mount scoring 127 7/8 inches and having an inside antler spread of 18 4/8 inches.
ST #864739 - 6 – Whitetail deer mount scoring 140 5/8 inches and having an inside antler spread of 16 4/8 inches.
ST #864732 – 1 - spotlight
ST #864732 – 2 - meat saw.
ST #864732 – 3 - robotic deer mount

ST #864732 – 4 - robotic deer head and antlers
ST #864732 – 5 - Ranger remote control
ST #864732 – 6 - Futaba remote control.
ST#: 81829 – Moonlight night vision binoculars
ST#: 81827 – Kodak Easy Share camera
ST#: 81842 – Lowrance GPS
ST #864736 – 6 - trail camera.
ST #864736 – 7 - trail camera.
ST #864736 – 8 - trail camera.
ST #864736 – 9 - trail camera
ST #864736 – 10 - trail camera.
ST #864736 – 13 - Knight muzzleloader serial # 5025653 (seized from vault).
ST #755963 – 1 - Whitetail deer antlers scoring 150 6/8 inches and having an inside antler spread of 17 1/8 inches.
ST #755963 – 2 - Whitetail deer antlers scoring 140 4/8 inches and having an inside antler spread of 17 3/8 inches.
ST #755963 – 3 - Whitetail deer mount scoring 146 7/8 inches and having an inside antler spread of 16 1/8 inches.
ST #755963 – Whitetail deer antlers and skull scoring 140 4/8 inches and having an inside antler spread of 17 3/8 inches.
ST #755963 – 5 - European whitetail deer mount scoring 121 5/8 inches and having an inside antler spread of 13 6/8 inches.
ST #832676 – 1 Deer Mount – Belonging to James BUTLER. Listed above
ST #832676 – 2 Deer antlers – Belonging to James BUTLER. Listed above
ST #832677 – 1 Deer antlers – Belonging to Burt STELLY
ST #755694 – 1 Whitetail deer antlers and skull scoring 144 5/8 inches and having an inside antler spread of 17 6/8 inches. Belonging to J.R. ROYCE
ST #756446 – Whitetail deer antlers scoring 150 6/8 inches and having an inside antler spread of 17 1/8 inches. Seized from J. RISINGER
ST #756451 – Whitetail deer mount scoring 155 3/8 inches and having an inside antler spread of 19 1/8 inches. Seized from Keith SWEARINGEN
ST #756452 – Whitetail deer mount scoring 143 7/8 inches and having an inside antler spread of 19 3/8 inches. Seized from Keith SWEARINGEN
ST #756447 – 1 - Whitetail deer antlers and skull scoring 121 2/8 inches and having an inside antler spread of 17 inches.
ST #756447 – 2 - Whitetail deer antlers and skull scoring 109 6/8 inches and having an inside antler spread of 15 5/8 inches.
ST #756448 – 1 - Whitetail deer antlers scoring 139 5/8 inches and having an inside antler spread of 19 7/8 inches.
ST #756448 – 2 - Whitetail deer antlers scoring 121 4/8 inches and having an inside antler spread of 18 2/8 inches.

pursuant to Title 16, United States Code, Section 3374(a), Title 18, United States Code, Section 924(d), Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461(c).

Further, if any of the property described above, as a result of any act or omission of the defendant(s):

(a) cannot be located upon the exercise of due diligence; or

(b) has been transferred or sold to, or deposited with, a third party; or

(c) has been placed beyond the jurisdiction of the court; or

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to 21 United States Code, Section 853(p), incorporated by 28 United States Code, Section 2461(c), including but not limited to a personal forfeiture money judgment.

A TRUE BILL

May 25, 2010
DATE

s/Foreperson
FOREMAN OF THE GRAND JURY

s/Lanny D. Welch
LANNY D. WELCH
United States Attorney
District of Kansas
1200 Epic Center, 301 N. Main
Wichita, Kansas 67202
(316) 269-6481
Ks. S. Ct. No. 13267

(It is requested that trial be held in Wichita, Kansas.)